**Juan VERDIN, Petitioner–Appellee,**

**v.**

**Michael O'LEARY and Neil F. Hartigan, Respondents–Appellants.**

**No. 90–3327.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1991.

Decided Aug. 28, 1992.

Carl P. Clavelli (argued), Chicago, Ill., for petitioner-appellee.

Arleen C. Anderson, Asst. Atty. Gen., Office of the Atty. Gen., Chicago, Ill., for respondents-appellants.

Before EASTERBROOK, RIPPLE, and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

In 1984, Juan Verdin was tried in Illinois for the killing of two men. The trial court gave the then-standard Illinois jury instructions on murder and voluntary manslaughter. During its deliberation, the jury sent a question to the trial judge. Without notifying counsel for either party, the judge returned to the jury a brief response to the question. The jury ultimately found Mr. Verdin guilty on both murder charges. After an unsuccessful appeal to the Illinois Appellate Court and the Illinois Supreme Court, Mr. Verdin petitioned the district court for a writ of habeas corpus. The district court ruled that both the jury instructions and the ex parte judge-jury communication were constitutionally improper and granted Mr. Verdin's petition for writ of habeas corpus. The State filed a timely notice of appeal from this decision. For the reasons set forth in this opinion, we reverse the judgment of the district court and remand for further proceedings.

I

BACKGROUND

A. *Facts*

In 1984, Juan Verdin was tried in the Circuit Court of Cook County, Illinois, for

killing Carlos Estrello and Alphonso Castro in a barroom shooting. At trial Mr. Verdin presented evidence and argument that he shot both men in self-defense. The record reflects the following facts. On June 2, 1984, at approximately 9:00 p.m., Mr. Verdin was present at Matchua Las Social Club, a club of about fifty Chicago residents whose families were originally from the Mexican town of Matchua Las. Also present were the victims, Carlos Estrello and Alphonso Castro, and four eyewitnesses who later testified for the State, Luis Guerrero, Miguel Martinez, Juan Perez–Moreno, and Niceforo Estrello. The club has two rooms separated by a bar and a thin wall. Mr. Verdin, Guerrero, Carlos Estrello, Martinez, and Perez–Moreno were all in the larger, front room of the club where the bar and two pool tables are located. Mr. Verdin and Mr. Guerrero were near the pool table and Carlos Estrello, Martinez and Perez–Moreno were sitting at the bar. Alphonso Castro and Niceforo Estrello were sitting in the back room, along with approximately fourteen other people, all members of a soccer team.

The State's witnesses testified that Mr. Verdin approached the bar from the pool table area and asked Carlos Estrello, "[W]hy are you looking at me?" Carlos answered, "[T]here's nothing wrong with that," Tr. at 244–45, "[s]ight is very natural." Tr. at 275, 291. Mr. Verdin then said, "[R]emember the other time?" Tr. at 245, 276, 291. Carlos answered, "[F]orget about it," Tr. at 245 "[it's] a dead issue." Tr. at 291.

Testimony of the State's witnesses as to what happened next is conflicting. Guerrero testified that the next thing he knew, he heard a shot. He turned around and saw Mr. Verdin with a gun in his hand. Carlos tried to grab the gun, then fell to the floor. Tr. at 245–46. Martinez testified that Mr. Verdin stuck his hand underneath his shirt and fired a gun at Carlos. Carlos raised his hands to defend himself but was, at the same time, falling to the ground. Mr. Verdin then fired two more shots at Carlos. Tr. at 276–77. Mr. Perez–Moreno testified that Mr. Verdin dropped his hand to his waist, and Carlos stood up and tried to grab Mr. Verdin's hand. Mr. Verdin then fired a shot at Carlos, and Carlos fell down. Mr. Verdin then raised the gun and waved it about "for no one to intervene," then fired it once towards the rear door and then twice more at Carlos. Tr. at 291–96. Holding the gun in his right hand, Mr. Verdin then headed toward the front exit. Tr. at 260, 296.

Niceforo Estrello, Carlos' brother testified that he was sitting in the back room when he heard the first shot. After he heard several more shots, he stood up and quickly headed for the front room. On the way, he saw Alphonso Castro lying on the floor in the back room.[1] As he turned into the front room, Niceforo saw his brother Carlos lying on the ground near the bar. He also saw a gun on the floor near his brother.[2] Niceforo picked up the gun and started shooting at Mr. Verdin, who was heading for the front exit. Niceforo saw Mr. Verdin shooting back in his direction, towards the back of the bar. Tr. at 218–21. Mr. Verdin then left through the front exit. Police soon found Mr. Verdin hiding behind a chimney on the roof of a nearby building. Police also found Mr. Verdin's gun behind a steel post in the alley. The gun used by Niceforo was also found under a car behind the club. Police also discovered bullet holes in the thin wall separating the club's two rooms.

While in custody and after being given his *Miranda* warning, Mr. Verdin spoke with a Chicago Police detective. The detective testified at trial that Mr. Verdin said he was making his way to the bathroom when he and Carlos began arguing, shoving, and pushing each other. Mr. Verdin told the detective that he heard a gunshot, pulled out his gun, and then heard three

---

1. Defense counsel strongly contested this. Defense counsel suggested that Niceforo lied about seeing Alphonso Castro's body on the way to the front room in order to shield himself from responsibility for drawing the fire which actually killed Alphonso Castro. Tr. at 239, 685.

2. Immediately following the shooting, Niceforo told a police detective that the gun was "next to" his brother. Tr. at 637–39. At trial, Niceforo testified that the gun was eight to ten feet from his brother. Tr. at 220.

more shots. Tr. at 376. Mr. Verdin told the detectives that he pulled a gun "because he didn't want to get beat up like he did the year before." Tr. at 380. When the detective asked about the earlier incident, Mr. Verdin said that a year prior to the shooting there had been a fight between his co-workers and some of the members of the Matchua Las club. According to Mr. Verdin, Carlos Estrello entered the fray with a knife, so Mr. Verdin grabbed a chain and began beating Carlos back. Several club members then jumped Mr. Verdin and beat him severely; Mr. Verdin had to be hospitalized. Tr. at 385–87.

Dr. Edmund Donoghue performed autopsies on both Carlos Estrello and Alphonso Castro. He testified that the autopsy of Carlos Estrello revealed that he was shot twice at close range. The fatal bullet entered Carlos' left shoulder, passed through his chest and exited the back of his body on the right side. There was also gun powder "strippling," or burns, on the back of Carlos' left forearm and also around the point where the bullet entered his shoulder, indicating a close gunshot wound. The autopsy of Alphonso Castro revealed an atypical gunshot wound in the chest. The wound was atypical in the sense that the bullet did not strike in the typical nose-on position, indicating that it struck something before it entered Castro's body.

A police serologist testified that she examined the lined shirt-coat that Mr. Verdin was wearing at the time of the shooting. She testified that she found bullet holes in the left front panel of the shirt and lead residue on the outside of the shirt around the hole. Her conclusion was that a gun had been fired at the shirt, from the outside, at close range. Tr. at 595–97. On cross-examination, she admitted that she could not date the lead residue; she could

not say how long the bullet hole had been in the shirt. Tr. at 597–98.

A police chemist testified that she performed residue tests on swabs of palms of several of the people involved in the shooting to determine whether there were high levels of metal residue. She found high levels in the swabs taken from the palms of Mr. Verdin and Carlos Estrello. In her opinion both of these men had their right hand "on a weapon when that weapon was fired." Tr. at 652–55.

Police photographs of Carlos Estrello's body taken immediately after the shooting reveal that his feet were next to the outside wall of the club and his head was toward the bar. Tr. at 338–39. A private investigator, hired by Mr. Verdin, testified that he took measurements at the club following the shooting. The measurements reveal that the distance between the point on the floor where Carlos Estrello's feet ended up and the bar was roughly nine and one-half feet. Tr. at 575–78.

Before the case was submitted to the jury, the judge gave standard jury instructions on both murder and voluntary manslaughter from *Illinois Pattern Jury Instructions (IPI) Criminal* (1981). These instructions have since been determined to be erroneous in two respects: (1) they placed upon Mr. Verdin the burden of proving whether he had the mitigating mental state of unreasonable belief that his actions were justified, and (2) they left the jury with the impression that it could convict Mr. Verdin of murder even if he had such a mitigating mental state. The first defect violates Illinois law, *see People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988),[3] while the second defect violates the Due Process Clause, *see Taylor v. Gilmore*, 954 F.2d 441 (7th Cir.1992), *petition*

---

**3.** Illinois has since changed its law, as noted in *People v. Brown*, 218 Ill.App.3d 890, 161 Ill.Dec. 522, 526, 578 N.E.2d 1168, 1172 (1991), *appeal denied*, 144 Ill.2d 636, 169 Ill.Dec. 145, 591 N.E.2d 25 (1992):

Defendant misplaces his reliance on *People v. Reddick* (1988), 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141, because that case was decided under the former voluntary manslaughter statute. Unlike the former voluntary manslaughter statute, where the mitigating factor

had to be disproved beyond a reasonable doubt by the State, the present second degree murder statute places the burden on the defendant to prove an unreasonable belief in the right to use self-defense by a preponderance of the evidence. (Ill.Rev.Stat.1987, ch. 38, par. 9–2(c).) The U.S. Supreme Court has ruled that such burden-shifting is not unconstitutional. *Patterson v. New York* (1977), 432 U.S. 197, 216, 97 S.Ct. 2319, 2330, 53 L.Ed.2d 281, 295.

*for cert. filed,* 60 U.S.L.W. 3783 (U.S. April 27, 1992) (No. 91–1738); *Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990).

Mr. Verdin's jury returned with verdicts of guilty on both charges, murder and voluntary manslaughter, with respect to both victims, Carlos Estrello and Alphonso Castro; there were four verdicts in all. Tr. at 747. Without consulting with counsel, the court then instructed the jury:

> Ladies and gentlemen, you understand that there cannot be a guilty [verdict] of both murder and manslaughter. Therefore I am going to ask you, ladies and gentlemen, to return to the jury room to decide as to which of your two verdicts is applicable.

Tr. at 747–48. After the jury left the room, defense counsel moved for a mistrial.[4] While the jury was re-deliberating and the parties had left the courtroom, the jury passed a note to the trial judge, who answered it without consulting counsel and without entering the note or his response on the record. After counsel returned, the following exchange occurred at sidebar between Mr. Nagelberg, who was Mr. Verdin's attorney, and the court:

> MR. NAGELBERG: Judge, between the time of you instructing the jury to go back, I left the courtroom and I believe [Assistant State's Attorney] Minelli left to research some law, and I understand the jury sent a message?
>
> THE COURT: They did.
>
> MR. NAGELBERG: For the record—
>
> THE COURT: And I answered their message.

MR. NAGELBERG: What was the particular question the jury asked?

THE COURT: The question was, if we find him guilty of the murder, should we bring back just the two verdicts. And I said, yes.

MR. NAGELBERG: Was that the entirety of their message?

THE COURT: That was the entirety of the message.

Tr. at 749. Mr. Nagelberg argued that clarification of the instructions as to the two offenses should have been given and again argued for a mistrial. The jury returned only two verdicts: guilty of the murder of Carlos Estrello, and guilty of the murder of Alphonso Castro.

The Illinois Appellate Court affirmed, and Mr. Verdin sought leave to appeal to the Illinois Supreme Court. While Mr. Verdin's petition for leave to appeal was pending, the Illinois Supreme Court decided *Reddick.* That court then granted Mr. Verdin leave to supplement his petition in light of this new, relevant decision. However, the Supreme Court later denied the amended petition as well as a later motion for reconsideration.

**B.** *District Court Proceedings*

Mr. Verdin then filed in the district court a petition for writ of habeas corpus. On June 27, 1990, the district court dismissed all of Mr. Verdin's claims except one related to a problematic *Miranda* warning. In particular, the court dismissed Mr. Verdin's claim that the jury instructions were consti-

---

**4.** THE CLERK: We the jury, find the defendant, Juan Verdin, guilty of the offense of murder of Carlos Estrello.

We the jury, find the defendant, Juan Verdin guilty of the offense of voluntary manslaughter of Carlos Estrello.

We, the jury, find the defendant, Juan Verdin, guilty of the offense of murder of Alfonso Castro.

We, the jury, find the defendant, Juan Verdin, guilty of the offense of voluntary manslaughter of Alfonso Castro.

THE COURT: Ladies and gentlemen, you understand that there cannot be a guilty [verdict] of both murder and manslaughter. Therefore, I am going to ask you, ladies and gentlemen, to return to the jury room to decide as to which of your two verdicts is applicable.

Give these verdicts back to the jury, please.

THE SHERIFF: Follow me.

 (Exit jury.)

THE COURT: All right.

MR. NAGELBERG: May I say something for the record, your Honor?

THE COURT: Yes, of course.

MR. NAGELBERG: Judge, based on the verdict, the nature of the verdict by the jury, the defense would be asking for a mistrial at this point.

THE COURT: That will be denied, Mr. Nagelberg.

Let's go back with our conferences in the meantime.

Tr. at 747–48.

tutionally inadequate. The court reasoned that Mr. Verdin waived this argument by failing to raise it in constitutional terms before the Appellate Court of Illinois. The district court also dismissed Mr. Verdin's claim that the ex parte judge-jury communication violated his right to a fair trial. The court found that the communication was a brief procedural remark that did not prejudice Mr. Verdin.

Two days later, on June 29, 1990, this court handed down *Falconer v. Lane*, 905 F.2d 1129, 1134 (7th Cir.1990), which held in part that (1) citing to *Reddick* is sufficient to constitute a federal constitutional challenge to jury instructions, (905 F.2d at 1134) and (2) the second *Reddick* holding—that failure, at trial and appeal, to challenge a jury instruction for not burdening the government with the fourth element of a murder charge does not constitute waiver—applies in federal court to overcome a waiver challenge to a habeas petition. *Falconer*, 905 F.2d at 1133–34. Relying on *Falconer*, Mr. Verdin petitioned the district court to reconsider its dismissal of his challenge to the jury instructions.

On September 12, the district court reconsidered its June 27 decision and granted Mr. Verdin's petition. In light of *Falconer*, the district court held that Mr. Verdin had not waived his *Reddick* challenge to the jury instructions. The court also interpreted *Falconer* as support for the conclusion that Mr. Verdin had exhausted his state court remedies. Finally, the district court ruled that the instructions were constitutionally infirm under *Reddick* and *Falconer*. Mem.Op. of Sept. 12, 1990 (R. 39) at 5–9, 1990 WL 133415.

The district court also reconsidered its dismissal of Mr. Verdin's challenge to the trial judge's ex parte communication with the jury. On reconsideration, the court concluded that "the record shows a likeli-

hood of prejudice from the *ex parte* contact and, therefore, petitioner is entitled to relief on that claim." R. 39 at 10. Thus, the district court granted the writ because of the constitutionally inadequate jury instructions and, alternatively, the trial court's ex parte communication with the jury.

## II

## ANALYSIS

On appeal, the State challenges both bases of the district court's judgment: the jury instruction error and the prejudicial ex parte judge-jury communication. The State submits that the question of jury instruction error, as presented to the district court, was not fairly presented on direct appeal in Illinois. The State also contends that the judge-jury communication was not prejudicial error. We address each of the State's submissions in turn.

### A. *The Jury Instructions: Fair Presentment*

#### 1. Legal principles

Under section 2254 of Title 28, "Before considering a petition for habeas corpus on its merits, a district court must make two inquiries—whether the petitioner exhausted all available state remedies and whether the petitioner raised all his claims during the course of the state proceedings. If the answer to either of these inquiries is 'no,' the petition is barred either for a failure to exhaust state remedies or for a procedural default." *Henderson v. Thieret*, 859 F.2d 492, 496 (7th Cir.1988), *cert. denied*, 490 U.S. 1009, 109 S.Ct. 1648, 104 L.Ed.2d 163 (1989). The Supreme Court has interpreted section 2254's definition of exhaustion[5] to require that a petitioner "fairly present" the federal issue to the state courts as a

---

**5.** The statute provides:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering

such process ineffective to protect the rights of the prisoner.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254.

precondition to exhaustion. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971).[6] It is also well-established that the issue of fair presentment is a useful approach for analyzing procedural default. *See United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 n. 4 (7th Cir.1984) ("[T]he analysis dealing with whether a state court has been fairly apprised of potential constitutional ramifications of a claimed trial court error is equally applicable to waiver cases.").

 The necessity of fair presentment of an issue to the state courts as a pre-condition to federal habeas relief is a manifestation, the Supreme Court has emphasized, of its concern for federal-state comity: "[I]t would be unseemly in our dual system of government for the federal courts to upset a state-court conviction without affording to the state courts the opportunity to correct a constitutional violation." *Duckworth v. Serrano,* 454 U.S. 1, 4, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981).[7] This concern for federal-state comity is grounded in the Supreme Court's understanding of the role that federal habeas corpus ought to play in the administration of justice in our federal system of government. Recently, our colleagues in the First Circuit summarized their understanding of this perspective:

> Federal habeas is not an ordinary error-correcting writ. The judicial systems of this nation have many-layered, multifaceted instruments to ensure that the intricate procedures of criminal trial and appeal are available to individuals and are properly employed by government actors. Habeas corpus is superimposed on these systems and constitutes an extraordinary remedy, regularly sought but less regularly granted, protecting fundamental federal rights by correcting certain important abuses which everyday legal mechanisms have failed to prevent.

In the course of state criminal proceedings, federal rights are fully cognizable. Federal habeas exists to rescue those in custody from the failure to apply federal rights, correctly or at all.

> The junction where federal habeas power intersects with state criminal processes is enswathed in a mutuality of respect between sovereigns. It is that principle of comity which underlies the federal courts' unwillingness to adjudicate too hastily matters of fundamental federal significance arising out of state prosecutions. Requiring that remedies be exhausted in state courts is merely comity's juridical tool, embodying the federal sovereign's respect for the state courts' capability to adjudicate federal rights. Although the federal courts, other conditions being met, will ultimately salve state error of constitutional dimension, the state must first be accorded the opportunity to protect the federally-assured interests of its criminal defendants.

*Nadworny v. Fair,* 872 F.2d 1093, 1096 (1st Cir.1989) (citations and footnotes omitted). Like the First Circuit, we have recognized our duty as an intermediate appellate court to accept this overarching jurisprudential perspective and to fashion judicial tools that ensure an evenhanded and, to the extent possible, easy application. To achieve these goals, we have adopted as a framework for our analysis the approach fashioned earlier by the Second Circuit in *Daye v. Attorney General of New York,* 696 F.2d 186, 194 (2d Cir.1982) (en banc):

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the main-

---

**6.** *Accord Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989); *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982).

**7.** *See also Rose v. Lundy,* 455 U.S. 509, 515, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982) ("In *Ex parte Royall,* 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886), this Court wrote that as a

matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act.... In *Ex parte Hawk,* 321 U.S. 114, 117, 64 S.Ct. 448, 450, 88 L.Ed. 572 (1944), this Court reiterated that comity was the basis for the exhaustion doctrine....").

stream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of any one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Pierson v. O'Leary,* 959 F.2d 1385, 1393 (7th Cir.1992) (citing *Sullivan,* 731 F.2d at 454 (quoting *Daye* )), *petition for cert. filed,* 61 U.S.L.W. —— (No. 91–8709) (June 22, 1992); *Whipple v. Duckworth,* 957 F.2d 418, 420 (7th Cir.1992), *petition for cert. filed,* 61 U.S.L.W. —— (No. 92–5041) (June 29, 1992). Other circuits employ similar, although not identical, formulations.[8]

■ The *Daye* formulation we have adopted makes it quite clear that, for a constitutional claim to be fairly presented to a state court, both the operative facts and the "controlling legal principles" must be submitted to that court. *Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971). "The fair presentation of facts has generated little ado. Rather, ... it is the latter prong of the *Picard* postulate—the sufficiency with which the applicant's legal theory was presented— which has much bedeviled courts." *Nadworny,* 872 F.2d at 1096. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam) (citations omitted).[9] In

dealing with this issue, we have sought to avoid hypertechnicality and to enforce the Supreme Court's mandate in light of its purpose—to alert fairly the state court to the federal nature of the claim and to permit that court to adjudicate squarely that federal issue. *See id.; Picard,* 404 U.S. at 275, 92 S.Ct. at 512. As we said in *Sullivan,* 731 F.2d at 453: "A habeas petitioner must provide the state courts with a fair opportunity to apply constitutional principles and correct any constitutional error committed by the trial court." Consequently, we have noted that a petitioner need not cite "book and verse of the federal constitution" to present a constitutional claim. *Id.* (quoting *Picard,* 404 U.S. at 278, 92 S.Ct. at 513). As Judge Kozinski has written for the Ninth Circuit:

> A claim is fairly presented if the petitioner has described the operative facts and legal theory on which his claim is based. *Picard v. Connor,* 404 U.S. at 277–78, 92 S.Ct. at 513. A habeas petitioner may, however, reformulate somewhat the claims made in state court; exhaustion requires only that the substance of the federal claim be fairly presented. *Id.* at 278, 92 S.Ct. at 513.

*Tamapua v. Shimoda,* 796 F.2d 261, 262 (9th Cir.1986); *see also Daye,* 696 F.2d at 192 n. 4; *United States ex rel. Kemp v. Pate,* 359 F.2d 749, 751 (7th Cir.1966). What is important is that the *substance* of the federal claim be presented fairly. *Anderson,* 459 U.S. at 6, 103 S.Ct. at 277; *see Varnell v. Young,* 839 F.2d 1245, 1248

---

**8.** *See, e.g., Nadworny v. Fair,* 872 F.2d 1093, 1097 (1st Cir.1989) (citations omitted):

> In partial reliance on *Daye,* and borrowing as we deemed prudent from other authorities, we developed over time a quadripartite set of guidelines. Three aspects are easily explained and, if applicable, easily spotted. If, in state court, a petitioner has 1) cited a specific constitutional provision, 2) relied on federal constitutional precedent, or 3) claimed a determinate right that is constitutionally protected, he will have employed a mechanism which significantly eases any doubt that the state courts have been alerted to the federal issue....
>
> In *Dougan* [*v. Ponte,* 727 F.2d 199, 201 (1st Cir.1984) (quoting *Daye,* 696 F.2d at 192) ], we also mentioned a fourth method by which presentment may be signalled, holding that "a petitioner can successfully claim that he has

> presented the same legal theory to the state court [if he] present[s] the substance of a federal claim in such a manner that it 'must have been likely to alert the court to the claim's federal nature.' "

**9.** *See also McKaskle v. Vela,* 464 U.S. 1053, 1055, 104 S.Ct. 736, 737, 79 L.Ed.2d 195 (1984) (Justice O'Connor, joined by Chief Justice Burger and Justice Rehnquist, dissenting from denial of certiorari) ("Of course, the state courts have the entire record, and thus the essential facts, before them in *every* constitutional case. But that is obviously beside the point. The exhaustion rule requires that the habeas petitioner ... identify for the state courts' attention the constitutional claim alleged to be inherent in those facts.").

(7th Cir.1988). It is incumbent on the petitioner to "raise the red flag of constitutional breach." *Dougan v. Ponte,* 727 F.2d 199, 201 (1st Cir.1984).

As Judge Selya pointed out in *Nadworny,* 872 F.2d at 1097, the principal interpretive hazard inherent in the *Daye* guidelines or similar formulations is one of specificity. And the problem of specificity is perhaps at its greatest when the court must deal with a procedural due process claim. Judge Kearse, writing for the Second Circuit in *Daye,* pointed out that the "more specific the description of the right in question— e.g., assistance of counsel, double jeopardy, self-incrimination—the more easily alerted a court will be to consider a constitutional constraint couched in similarly specific terms." 696 F.2d at 193 (footnote omitted). By contrast, with respect to due process claims, the contours of the possible constitutional claims are, of course, particularly indistinct and the overlap of state and federal jurisprudence particularly striking. Here, there is a special danger that a claim in state court "may well present the echo of a federal claim," *Nadworny,* 872 F.2d at 1098, while still not alerting the state court to the federal nature of the claim. A federal constitutional claim may be "inherent" in the facts, *Picard,* 404 U.S. at 277, 92 S.Ct. at 513, but not recognizable as such without further elaboration. On this basis, courts have rejected bare allegations that the defendant was not given a fair trial. *See Dougan,* 727 F.2d at 201; *see also Daye,* 696 F.2d at 193. Vague or cursory references to "due process" have raised similar hesitations. *See Gagne v. Fair,* 835 F.2d 6, 7–8 (1st Cir.1987); *Dyer v. Ponte,* 749 F.2d 84, 86 (1st Cir.1984).

There are, no doubt, occasions when the vagueness inherent in a claim of procedural fairness can be resolved by examination of the facts:

> The general principle governing assessment of whether a fair trial claim is of constitutional dimension is that where the claim rests on a factual matrix that is "well within the mainstream of due process adjudication,". *Johnson v. Metz,* [609 F.2d 1052, 1067 (2d Cir.1979)] (Newman, J., concurring); *see also id.* at 1056

n. 5 (opinion of the Court), the state courts must be considered to have been fairly alerted to its constitutional nature. If, on the other hand, the claim is based on a fact pattern not theretofore commonly thought to involve constitutional constraints, there is usually little reason to believe the courts were alerted to its supposed constitutional nature.

*Daye,* 696 F.2d at 193. However, this approach can be the basis of decision in only the most obvious case; reliance on such a methodology places great stress on the Supreme Court's admonition in *Picard* that *both* factual content and federal legal theory be presented to the state court. 404 U.S. at 277, 92 S.Ct. at 513. As the First Circuit noted in *Nadworny*

> Rhetoric arguing that a claim previously asserted without federal citation or other conspicuous federal emblemata nonetheless fell within some hypothetical "mainstream" of constitutional litigation has an oxymoronic quality. Such a boast carries worthwhile cargo only when a local legal culture has adopted a particular idiom for, or formulation of, a federal claim that is consonant with the federal courts' interpretation. That, of course, is a rare bird.

872 F.2d at 1098.

Reliance solely on state cases can be problematic as well. Of course, if those state cases rest on federal constitutional grounds, they must be accepted on that basis by the habeas court. Indeed, there may even be situations in which federal cases are not available and the only authority interpreting federal law will be state cases. However, when the cited cases articulate only state law principles and available federal precedent has been omitted from the presentation, the explicit admonition of the Supreme Court in *Anderson* must be heeded: "We doubt that a defendant's citation to a state-court decision predicated solely on state law ordinarily will be sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the *cited* case advanced a federal claim." 459 U.S. at 7 n. 3, 103 S.Ct. at 278 n. 3 (emphasis in origi-

nal). No doubt, there are situations in which federal and state claims will be functionally identical—facts *and* legal theory are the same—and only the formal formulation is different. *See Picard,* 404 U.S. at 277, 92 S.Ct. at 513. Such identical claims are often difficult to identify. As the First Circuit has noted, "it is perilous to generalize too broadly from these decisions. Substantive deviations between superficially similar federal and state claims often exist. State courts are increasingly conscious that state law and the Constitution, though identically or similarly worded, may be differently construed." *Nadworny,* 872 F.2d at 1100. Here it seems appropriate to place the burden on the petitioner to demonstrate that the "clonal relationship of the federal and state claims which would have likely alerted the state tribunal to the federal nuances." *Id.* In resolving the matter, the habeas court must determine whether, as a *pragmatic* matter, it is probable that the state tribunal was alerted to the federal quality of the claim.

■ At bottom, the task of the habeas court in adjudicating any issue of fair presentment is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis. We must now make such a pragmatic assessment in this case.

2. Applied to this case

■ In the district court, Mr. Verdin challenged the jury instructions primarily on two grounds. First, that the instructions did not instruct the jury that the state has the burden of disproving the mitigating mental state of unreasonable belief. R. 20 at 8–10, R. 32 at 6. The Illinois Supreme Court relied upon this reason to strike down identical instructions in *Reddick.* However, in *Taylor v. Gilmore,* 954 F.2d 441, 449 (7th Cir.1992), *petition for cert. filed,* 60 U.S.L.W. 3783 (U.S. April 27, 1992) (No. 91–1738), this court held that this ar-

gument is without a federal constitutional basis and that *Reddick* was grounded solely on Illinois criminal law. Thus, Mr. Verdin's claim on this ground is not cognizable on habeas review.

■ Second, Mr. Verdin suggests that the instructions misled the jury into thinking that they could find him guilty of murder even though he had the mitigating mental state of unreasonable belief that his actions were justified. R. 20 at 7, 10–11. This court used this reason to strike down identical instructions in *Falconer v. Lane,* 905 F.2d 1129, 1136 (7th Cir.1990):

> [T]he jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction.... No matter how clearly either the State or the defense proved the existence of the mitigating "manslaughter defenses," the jury could nevertheless return a murder verdict in line with the murder instruction as given.

*See also Flowers v. Illinois Dep't of Corrections,* 962 F.2d 703, 705 (7th Cir.1992); *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 680 n. 1 (7th Cir.1991); *Rose v. Lane,* 910 F.2d 400, 401 n. 1 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990). In *Taylor,* we noted that this part of *Falconer* was based upon *Connecticut v. Johnson,* 460 U.S. 73, 84–85, 103 S.Ct. 969, 976, 74 L.Ed.2d 823 (1983), in which the Supreme Court ruled that the Due Process Clause forbids instructions which lead a jury to ignore exculpatory evidence in finding that the government proved the defendant guilty beyond a reasonable doubt.[10] We also suggested in *Taylor,* 954 F.2d at 452–53, that *Falconer* was based upon *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), in which the Supreme Court held that instructions are constitutionally infirm if "there is a reason-

---

**10.** *Taylor,* 954 F.2d at 453 ("[The *Johnson*] Court explained that the instructions were forbidden because they led the jury to ignore exculpatory evidence in finding the defendant guilty of murder beyond a reasonable doubt. We believe that this due process principle is specific enough to have dictated the result in *Falconer.*") (citations and footnote omitted).

able likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." It is on these federal constitutional bases, if any, that Mr. Verdin must rest his challenge to the jury instructions.

We must consider, then, whether Mr. Verdin fairly presented to the Illinois Appellate Court, on direct appeal from his conviction, the claim that the instructions violated the Due Process Clause because they lead the jury to ignore constitutionally relevant, exculpatory evidence. In his main brief to the Illinois Appellate Court, Mr. Verdin did not expressly claim that the jury instructions violated his rights under the Due Process Clause. Rather, Mr. Verdin argued that the court erred when it refused to instruct the jury that, "[t]o sustain the charge of murder, the State must prove ... [t]hat the defendant did not believe that circumstances existed which justified the use of force which he used." R. 12 Ex.C at 47–48. Mr. Verdin suggested that this "fourth proposition," which had been included in the 1968 version of the Illinois Pattern Jury Instructions, but was omitted in the 1981 edition used by the court, was necessary for the jury to understand the difference between murder and voluntary manslaughter:

> The omission of such an instruction in the issues instruction on murder was error because the jury was confused about the difference between murder and voluntary manslaughter which is apparent from guilty verdicts on both these offenses and the question they later asked the court.... The omission here of such a fourth proposition prejudiced Verdin because at no time was the jury informed of the distinction between these two offenses.

R. 12 Ex.C at 47–48. In support of his argument, Mr. Verdin cited three Illinois cases: *People v. Almo*, 108 Ill.2d 54, 90 Ill.Dec. 885, 483 N.E.2d 203 (1985); *People v. Hoffer*, 106 Ill.2d 186, 88 Ill.Dec. 20, 478 N.E.2d 335, *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985); and *People v. Bolden*, 132 Ill.App.3d 1047, 87 Ill.Dec. 852, 477 N.E.2d 1380 (1985), *appeal*

*denied*, 108 Ill.2d 574 (1985). Each of these cases discusses the interrelationship between the Illinois pattern jury instructions on murder and voluntary manslaughter, but not in terms of their leading the jury to ignore exculpatory evidence. *Almo* discusses whether failure to include the "fourth proposition" may lead to legally inconsistent verdicts, and concludes that the issue was mooted by the trial judge's additional instruction, which informed the jury that if they found the defendant guilty of one offense they must not return a verdict on the other offense. 90 Ill.Dec. at 888–90, 483 N.E.2d at 206–08. *Hoffer* addresses the problem of actual inconsistent verdicts of murder and voluntary manslaughter stemming from the 1981 Illinois Pattern Jury Instructions. The *Hoffer* court concluded that the verdicts were legally and logically inconsistent and thus required a new trial. 88 Ill.Dec. at 25, 478 N.E.2d at 340. In support of this holding, *Hoffer* cited two Illinois cases, *People v. Frias*, 99 Ill.2d 193, 75 Ill.Dec. 674, 457 N.E.2d 1233 (1983), and *People v. Hairston*, 46 Ill.2d 348, 263 N.E.2d 840 (1970), *cert. denied*, 402 U.S. 972, 91 S.Ct. 1658, 29 L.Ed.2d 136 (1971), both of which prohibit inconsistent verdicts based upon a collateral estoppel principle which, they note, the Supreme Court held in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), is embodied in the Fifth Amendment guarantee against double jeopardy. *Hoffer*, 88 Ill.Dec. at 25, 478 N.E.2d at 340. Indeed, *Hoffer* later cites *Ashe* in that regard. 88 Ill.Dec. at 27, 478 N.E.2d at 342. *Bolden*, the third case cited by Mr. Verdin, addressed the issue of whether voluntary manslaughter is properly considered a lesser included offense of murder. The *Bolden* court held that voluntary manslaughter is a lesser included offense, but that the 1981 jury instructions "are not adequate and that the trial courts and counsel should instruct juries in conformity with the views expressed in *Hoffer*." 87 Ill.Dec. at 859, 477 N.E.2d at 1387. None of these cases refers to the Due Process Clause or cites cases referring to the Due Process Clause. Notably, the State, in response to Mr. Ver-

din's challenge to the jury instructions, felt no necessity to discuss the claim in terms of causing the jury to ignore exculpatory evidence; it did not mention the Due Process Clause or cite due process cases in connection with this claim. Mr. Verdin's reply brief refers neither directly nor indirectly to the Due Process Clause. Finally, without reference to constitutional provisions, rights, cases, or analysis, the Illinois Appellate Court rejected Mr. Verdin's challenge to the jury instructions.

Applying the fair presentment analysis of *Daye,* we note that, on direct appeal, Mr. Verdin did not rely on pertinent federal cases employing federal due process analysis. Rather, he relied on three state cases, none of which applied constitutional analysis. In this regard, the situation before us is quite analogous to the situation faced by the Supreme Court in *Anderson.* The petitioner in that case was convicted of two counts of first-degree murder and sentenced to life imprisonment. He appealed his conviction to the Michigan Court of Appeals, contending that the trial court's instruction on malice (which he stressed was a crucial element in distinguishing between second-degree murder and manslaughter under Michigan law) was "reversible error." In his brief to the state court, the petitioner cited a Michigan case "predicated solely on state law in which no federal issues were decided, but in which the defendant had argued broadly that failure to properly instruct a jury violates the Sixth and Fourteenth Amendments." *Anderson,* 459 U.S. at 6, 103 S.Ct. at 277. The Court determined that a federal issue had not been fairly presented. The present case falls within the blunt admonition of the Court in *Anderson:*

> We doubt that a defendant's citation to a state-court decision predicated solely on state law ordinarily will be sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the *cited* case advanced a federal claim. However, it is clear that such a citation is insufficient when, as here, the federal claim asserted in the cited case is not even the same as the federal claim on which federal habeas relief is sought.

459 U.S. at 7 n. 3, 103 S.Ct. at 278 n. 3.

■ Nor did Mr. Verdin "assert his claim in terms so particular as to call to mind a specific constitutional right." *Daye,* 696 F.2d at 194. Mr. Verdin asserted his claim in terms of the need to instruct the jury on the "fourth proposition"—that, in order to prove murder, the State must prove that the defendant did not believe that circumstances existed to justify his actions—in order to allow the jury to distinguish murder from voluntary manslaughter. We cannot agree that these are "terms so particular as to call to mind" the constitutional right addressed by this court in *Falconer* and *Taylor,* and by the Supreme Court in *Johnson.*[11] Finally, the pattern of facts alleged by Mr. Verdin was not so "well within the mainstream of constitutional litigation" that the Illinois Appellate Court should have recognized his claim as one stemming from the Due Process Clause or the *Johnson–Boyde* line of cases.[12] It is, of course, well-established that the Due Process Clause is violated if, in evaluating

---

**11.** *Compare Grady v. LeFevre,* 846 F.2d 862, 865 (2d Cir.1988) (argument that expert testimony was impermissible "bolstering" insufficient to call to mind the right to effective confrontation), *and Evans v. Court of Common Pleas,* 959 F.2d 1227, 1233 (3d Cir.1992) (assertion that evidence presented at trial was insufficient to prove that the defendant had the requisite malice for murder qualified as an assertion in term so particular to call to mind a specific right protected by the Constitution), *with Waterhouse v. Rodriguez,* 848 F.2d 375, 381 (2d Cir.1988) (claim that attorney's disbarment "substantially affected" his client's representation sufficed to call to mind the right to effective assistance of counsel), *and Daye v. Attorney General of New*

*York,* 696 F.2d 186, 193 (2d Cir.1982) (using as examples the use of the terms "assistance of counsel, double jeopardy, self-incrimination").

**12.** *See Stewart v. Scully,* 925 F.2d 58, 62 (2d Cir.1991) (allegation that "the court's resentence is an impermissible enhancement of punishment that runs afoul of our constitutional and decisional law" is "clearly a scenario within the mainstream of double jeopardy litigation"); *Daye,* 696 F.2d at 196 (claim that an obviously partial judge deprived defendant of a fair trial was well within the mainstream of due process litigation).

an infirm instruction in the context of all the instructions, the court concludes that the infirm instruction "infected the entire trial." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). However, before an instruction can be so characterized "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Id.* at 146, 94 S.Ct. at 400. In short, in evaluating federal due process claims, the inquiry must be at a sufficient level of specificity to advise the state court of the particular Fourteenth Amendment right at issue. At the time Mr. Verdin presented his argument to the Illinois Appellate Court, the judges of that court had to assess the instruction in light of the governing legal principles at that time. The federal due process dimension of this specific instructional problem was not identified even in general terms until *Falconer* and not specifically characterized as having its roots in *Johnson* and *Boyde* until *Taylor*. While a federal due process dimension to this instructional problem is recognized today as the law of the circuit, some jurists are not convinced that the problem posed by the instruction is federal in character. *See Flowers v. Illinois Dep't of Corrections,* 962 F.2d 703, 707–12 (7th Cir.1992) (Easterbrook, J., concurring). As the First Circuit stressed in *Nadworny,* in dealing with fair presentment,

> the crux of the matter relates to probability. And probability must be reflected not by speculation or surmise, but by trappings—specific constitutional language, constitutional citation, appropriate federal precedent, substantive constitutional analogy, argument with no masking state-law character, and the

like—such as would in all likelihood alert a reasonable jurist to the existence of the federal question.

872 F.2d at 1101. We cannot say that a judge of the Illinois Appellate Court would with any likelihood have been alerted to the federal constitutional question lurking behind Mr. Verdin's statement of the facts and citation to state law. "Federal judges will not presume that state judges are clairvoyant." *Petrucelli v. Coombe,* 735 F.2d 684, 689 (2d Cir.1984). Thus, we conclude that Mr. Verdin failed to present fairly his due process challenge to the jury instructions to the Illinois courts.[13]

### B. *The Ex Parte Judge–Jury Communication*

Mr. Verdin also alleged in his petition that the trial court violated his constitutional rights when it took a note from the deliberating jury and, in the absence of and without input from counsel, answered it. No part of this exchange was on the record; it was not until defense counsel inquired of the court at sidebar that the trial judge revealed that the jury had asked, "If we find him guilty of the murder, should we bring back just the two verdicts?", and that he had responded, "Yes." Tr. at 749; *see supra* p. 1471. Mr. Verdin further submits that this situation must be evaluated in context; the trial judge had previously instructed the jury "that there cannot be a guilty [verdict] of both murder and manslaughter." Tr. at 747.

### 1. Fair presentment

■ In his petition and supporting memorandum, Mr. Verdin suggested to the district court that this ex parte communication violated his "constitutional right to be

---

13. Mr. Verdin argues that, even if he failed to present fairly his claim on direct appeal, he presented it to the Illinois courts in his petition for rehearing to the appellate court and his petition for leave to appeal to the supreme court. We are unable to locate in those documents the *Falconer*-like argument that Mr. Verdin now makes, other than as might be implied in the tag-line references to "due process" and "U.S. Const., Amend. XIV." More importantly, the Supreme Court made clear in *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 1060, 103 L.Ed.2d 380 (1989), that submitting a claim to the state's highest court on discretionary review does not constitute fair presentment. And, as this court stated in *Cruz v. Warden of Dwight Correctional Center,* 907 F.2d 665, 669 (7th Cir. 1990), presentation of a claim for the first time to a state appellate court in a petition for rehearing is similarly insufficient.

present and to have the assistance of counsel." R. 1 at 6–7; R. 20 at 9. Thus, we must first consider whether this constitutional claim was fairly presented to the Illinois courts. On direct appeal to the Illinois Appellate Court, Mr. Verdin argued that the ex parte judge-jury communication was reversible error:

The proper procedure for giving additional instructions to a jury or for responding to a jury's question is to discuss the situation with counsel from both sides. *People v. Tansil,* 137 Ill.App.3d 498 [92 Ill.Dec. 314], 484 N.E.2d 1169 (1985). Further, it is improper for the trial court to communicate with a jury during its deliberations out of the presence of the attorneys. Private communications by a court with the jury are reversible error if the defendant is prejudiced by the communications. *People v. Canaday,* 49 Ill.2d 416, 275 N.E.2d 356 (1971); *People v. Briggman,* 21 Ill. App.3d 747, 316 N.E.2d 121 (1974).

R.12 Ex.C at 61. In *People v. Tansil,* 137 Ill.App.3d 498, 92 Ill.Dec. 314, 484 N.E.2d 1169 (1985), the state appellate court held that the trial court erred in responding to a question from the jury in the absence of counsel. The *Tansil* court based its holding in part upon the Sixth Amendment: "It is well established that a defendant has the right to be present at all stages of the trial which involve his or her substantial rights. (U.S. Const., amend. VI; Ill.Const. 1970, art. I, § 8; ...)." 92 Ill.Dec. at 317, 484 N.E.2d at 1172. *See also People v. Briggman,* 21 Ill.App.3d 747, 316 N.E.2d 121, 125–26 (1974) (addressing the issue as one of constitutional error). Mr. Verdin concluded his argument on direct appeal:

In conclusion, the court's actions here were improper. It was error ... to answer the jury's question off the record without defense counsel's knowledge or input. Verdin's convictions should be reversed and his case remanded for a new trial because his rights to a fair trial and to be present at critical stages of his trial were violated.

R. 12 Ex.C at 63.

Once again applying the fair presentment analysis outlined above, we note that,

on direct appeal, Mr. Verdin did not rely on pertinent federal cases employing constitutional analysis. Nonetheless, he did rely upon state cases applying constitutional analysis or making reference to the Constitution. Mr. Verdin presented his claim as based in part upon his right "to be present at critical stages of his trial" and his right "to a fair trial." These terms are particular enough to call to mind a defendant's right—stemming from the Sixth Amendment and Fourteenth Amendment—to be present at his trial. Mr. Verdin also presented to the Illinois Appellate Court a pattern of facts that falls within the mainstream of constitutional litigation under those constitutional provisions. *See, e.g., Young v. Herring,* 938 F.2d 543, 556–57 (5th Cir.1991) (discussing Sixth Amendment and Fourteenth Amendment implications of ex parte judge-jury communications), *cert. denied,* —— U.S. ——, 112 S.Ct. 1485, 117 L.Ed.2d 627 (1992); *United States v. York,* 830 F.2d 885, 894 & n. 5 (8th Cir.1987) (same), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988); *United States v. Widgery,* 778 F.2d 325, 329 (7th Cir.1985) (same). Thus, we conclude that Mr. Verdin fairly presented this constitutional challenge to the ex parte judge-jury communication to the Illinois courts.

### 2. District court analysis

In its June 27, 1990, Opinion and Order, 1990 WL 103653, the district court reviewed the caselaw on this issue and concluded that a communication between judge and jury outside of the presence of counsel does not violate the Constitution unless it "so infects the trial process as to make the trial as a whole fundamentally unfair." R. 31 at 12–13. In arriving at this conclusion, the court relied upon *United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), in which the Supreme Court held:

"[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and

a juror, nor is there a constitutional right to have a court reporter transcribe every such communication."

470 U.S. at 526, 105 S.Ct. at 1484 (quoting *Rushen v. Spain*, 464 U.S. 114, 125–26, 104 S.Ct. 453, 459, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring in judgment)). The district court also relied upon this court's subsequent conclusion that "[a] judge's failure to show jurors' notes to counsel and allow them to comment before responding violates Fed.R.Crim.P. 43(a), not the Constitution." *United States v. Widgery*, 778 F.2d 325, 329 (7th Cir.1985). In order to estimate the effect that the judge-jury communication had on the trial, the district court looked to the reasoning of the Illinois Appellate Court. The Illinois court had held that the additional instruction "did not mislead the jury." R. 12 Ex.A at 16. The district court deferred to this factual finding as fairly supported by the record. R. 31 at 14. From these premises, the district court concluded that the ex parte communication did not have sufficient prejudicial effect to rise to the level of a constitutional violation.

Ten weeks later, on September 12, the district court reversed itself on this issue. In light of the intervening decisions in *Falconer* and *Rose*, the court found that the judge-jury communication combined with the jury instructions to confuse the jury as to which verdict it should return if it found the elements of both counts to be satisfied. R.39 at 9. The district court concluded that "the record shows a likelihood of prejudice from the *ex parte* contact and, therefore, petitioner is entitled to relief on that claim." R. 39 at 10.

3. Discussion

■ When reviewing a district court's decision to grant or deny a petition for a writ of habeas corpus, we consider all questions of law de novo. *Matta–Ballesteros v. Henman*, 896 F.2d 255, 258 (7th Cir.), *cert. denied*, ——— U.S. ———, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990). However, under the mandate of 28 U.S.C. § 2254(d), "in a habeas corpus proceeding, state court factual findings that are reasonably based on the record are accorded a presumption of correctness." *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217, 218–19 (7th Cir.), *cert. denied*, 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *see also Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir. 1992).

■ The district court was correct to rely upon the Supreme Court's guidance in *Gagnon* and our decision in *Widgery* to handle the ex parte judge-jury communication. These two cases provide the legal standards against which Mr. Verdin's claim must be measured. In addition to the portion of *Gagnon* quoted above, the following passage of that opinion guides our review:

The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder v. Massachusetts*, 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674] (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record.

470 U.S. at 526–27, 105 S.Ct. at 1484 (citations omitted). In *Widgery*, we reiterated the *Gagnon* Court's distinction between the right to presence stemming from the Sixth Amendment (when the defendant is actually confronting witnesses or evidence against him), and the right to presence stemming from the Due Process Clause. 778 F.2d at 330. In Mr. Verdin's case, the jury question and the trial court's response did not implicate Sixth Amendment concerns; no witnesses or evidence were

presented against him in his absence. Rather, if Mr. Verdin had a constitutional right to be present at the exchange, it stemmed from his due process right to be present "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge ... to the extent that a fair and just hearing would be thwarted by his absence." *Gagnon,* 470 U.S. at 526, 105 S.Ct. at 1484. As we noted in *Widgery,* "Only a trial fundamentally unfair in light of the entire proceedings violates the open-ended aspect of [this] constitutional protection." 778 F.2d at 330.

As the district court noted in its original opinion on this issue, the Appellate Court of Illinois found that the trial court's ex parte comments to the jury had little or no prejudicial impact on Mr. Verdin:

> [T]here is nothing in the record to indicate that this question was asked for any reason other than to clarify a procedural point regarding which verdict forms should be returned on the basis of the jury's finding.
>
> . . . .
>
> . . . . [T]he court's affirmative response to the jury's question was [nothing] more than a clarification of a procedural point which can be categorized as a brief explanatory remark and such remark did not impact the deliberations.... [W]e also find no merit to the contention that the additional instruction misled the jury.
>
> . . . .
>
> . . . . Because we have already concluded that any confusion upon the part of the jury was clarified by the additional instruction and that the court's affirmative response to the jury's question did not mislead the jury, we find that the defendant was not prejudiced and therefore there is no reason to reverse this case for a new trial.

*People v. Verdin,* No. 85–2344, unpub. op. (R. 12 Ex.A) at 15–16 [167 Ill.App.3d 1166, 131 Ill.Dec. 545, 538 N.E.2d 920 (table)] (Ill.App.Ct. March 17, 1988). In *Rushen v. Spain,* 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983), the Supreme Court held

> The substance of the *ex parte* communications and their effect on juror impar-

tiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of "convincing evidence" to the contrary, by the federal courts.

In this case, we approach the application of this rule cautiously. If the determination of the Illinois Appellate Court is grounded in a misunderstanding of the law with respect to the appropriate instructions, *see Reddick, Falconer, Taylor, supra,* we cannot defer to its determination. However, after an examination of the trial transcript, we believe that the Illinois Appellate Court's assessment of this brief statement by the trial judge is not linked to its view on the correctness of the instructions. It is more accurate to characterize the brief judge-jury exchange as a "follow-up" on the judge's earlier instructions and limited to the form of the jury verdicts. The time to request clarifying instructions on the substantive law (assuming they *would* have sufficed, *see Flowers v. Illinois Dept. of Corrections,* 962 F.2d 703, 705 (7th Cir. 1992)) would have been earlier, upon the return of the conflicting verdicts. We have reviewed the transcript of the exchange between court and counsel at the time of the submission of the contrary verdicts. At that point, counsel was present and had an adequate opportunity to request clarifying instructions.

### Conclusion

Because we accept the Illinois Appellate Court's finding that the trial court's communication with the jury was a brief procedural remark that did not mislead the jury, we must conclude that fairness and justice were not thwarted by Mr. Verdin's absence at the exchange. *See Gagnon,* 470 U.S. at 526, 105 S.Ct. at 1484. Nor did the ex parte judge-jury communication render the trial fundamentally unfair. *See Widgery,* 778 F.2d at 330. Thus, we conclude that the district court was correct in its original assessment of this claim: the ex parte communication did not have sufficient prejudicial effect to rise to the level of a due process violation.

Three additional matters must be noted. First, because the district court granted the

writ of habeas corpus on the basis of the two issues we have discussed, it perceived no need to resolve the *Miranda* issue. Memorandum Opinion and Order of September 12, 1990, (R. 39) at 10 & n. 5, 1990 WL 133415. That issue now must be addressed by the district court. Second, in response to the district court's initial conclusion that he had waived his due process claim, Mr. Verdin argued that such waiver "must be excused under the 'cause and prejudice test' due to the 'novelty' of the issue at the time." Motion and Memorandum of July 9, 1990, (R. 32) at 5. Because the district court reversed itself and found, in light of *Falconer*, that Mr. Verdin had not waived the due process claim, the cause and prejudice analysis was never fully explored. For similar reasons, Mr. Verdin should be given an opportunity to persuade the court that failure to consider his federal claim would result in a miscarriage of justice. *See Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992) (discussing the "narrow scope of the fundamental miscarriage of justice exception"). The district court must now consider whether either of these two exceptions to waiver are available to Mr. Verdin.

Third and finally, noting that exhaustion of state remedies is determined at the time that the petition for habeas corpus is filed, *see United States ex rel. Johnson v. McGinnis,* 734 F.2d 1193, 1196 (7th Cir. 1984), the district court ruled that Mr. Verdin had exhausted his state remedies because there was no "direct precedent indicating that the Illinois courts [would] relax the waiver rule," *Gray v. Greer,* 707 F.2d 965, 968 (7th Cir.1983), to allow Mr. Verdin to present his *Reddick* claim in a petition for post-conviction relief. Subsequent to the petition, however, the Illinois Supreme

Court handed down *People v. Flowers,* 138 Ill.2d 218, 149 Ill.Dec. 304, 561 N.E.2d 674 (1990), and *People v. Shields,* 143 Ill.2d 435, 159 Ill.Dec. 40, 575 N.E.2d 538 (1991). *Flowers* and *Shields* suggest that, with respect to a case that was pending on direct review when *Reddick* was decided, as was Mr. Verdin's, *Reddick* error may be addressed in a post-conviction proceeding regardless of whether it would ordinarily be considered waived.[14] Nothing we have said here is meant to prejudice Mr. Verdin's right to pursue this Illinois post-conviction remedy.[15]

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

14. Although Illinois' post-conviction procedure may only be used to redress the denial of a constitutional right, *Flowers,* 149 Ill.Dec. at 311, 561 N.E.2d at 681, and this court has held that *Reddick* has no basis in the federal constitution, *Taylor,* 954 F.2d at 449, Illinois may perceive *Reddick* to be based in part upon its own constitution and, thus, still allow *Reddick* claims to be raised in a post-conviction petition.

15. At oral argument, the State's attorney argued that, in light of *Shields* and *Flowers,* "Illinois

should be given an opportunity to grant relief to this petitioner.... It has only recently become clear that Illinois will afford a remedy to the defendant." If Mr. Verdin does file a post-conviction petition in Illinois court, we expect that the State will not oppose such a petition, as it did in *Falconer,* by taking the position that "the state Supreme Court's denial of leave to appeal constituted a decision on the merits barring further judicial review by the state courts." *Falconer,* 905 F.2d at 1132.