**Janice BRAUNREITER, Petitioner,**

v.

**Kristine KRENKE, Respondent.**

No. 98–C–1103.

United States District Court,
E.D. Wisconsin.

Dec. 19, 2000.

Keith A. Findley, Madison, WI, for Petitioner.

Sally Wellman, Madison, WI, for Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

Petitioner Janice Braunreiter seeks a writ of habeas corpus vacating her state court conviction of first degree intentional homicide. She argues that the trial court denied her due process of law by refusing to permit her to plead guilty to the lesser charge of first degree reckless homicide. Although I believe that an injustice was done to petitioner I have reluctantly concluded that I am not authorized to grant relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner, who was in her forties, lived with the male victim, who was in his late seventies. Apparently, the two often argued and had a "drunken kind of relationship." (R. 12 Ex. B App. at 137.) On the date of the victim's death petitioner and the victim argued, she followed him downstairs, pulled him away from the telephone and knocked him on the floor. When he did not move she panicked and put a barbell on his chest to make it look like an accident. The victim was later found dead on the floor with the barbell on his throat. The cause of death was determined to be asphyxiation.

Initially the state charged petitioner with first degree reckless homicide, an offense punishable by forty years imprisonment, for which a prisoner is parole eligible after ten years. As the trial date neared, the state amended the charge to first degree intentional homicide, an offense punishable by life imprisonment. Shortly thereafter, the parties agreed that petitioner would plead guilty to first degree reckless homicide.

### A. Proceedings on February 21

On February 21, 1996, petitioner attempted to enter her guilty plea. During the plea colloquy petitioner confirmed that she understood the nature of the charge, the maximum penalties, her right to a jury trial, and the things the state would have to prove if the case went to trial. She acknowledged that she had gone over a written waiver of rights form and signed it after discussing it with her lawyer.

The trial court then asked petitioner, an alcoholic with a high school education, a question that ran for almost two full pages of the hearing transcript. The question, which included a number of topics, among them the elements of both intentional homicide and reckless homicide, was as follows:

> You do have the right to contest this charge, and that includes the right to bring motions challenging the legal sufficiency of the charge, motions challenging the evidence that the State wants to offer at a jury trial, and it includes the right to have a jury trial where twelve

people would listen to the evidence and decide whether you were guilty or not guilty.

At a trial on the charge of first degree reckless homicide, before they could find you guilty of this charge, all twelve jurors would have to be satisfied beyond a reasonable doubt that you caused the death of Johanas Spolowicz, that you did this by criminally reckless conduct, and that you did so under circumstances which showed utter disregard for human life. Those are the three elements that all twelve jurors would have to agree on beyond a reasonable doubt before they could find you guilty of this charge.

Now, if we went to trial, it may be that the trial would include a trial on first degree intentional homicide and that has different elements, different things that the jurors would have to find. But even at that trial, it may well be that other lesser degrees of homicide would be submitted to the jury, and the jury would have to decide whether you were guilty of anything at all, and if you were, what level of homicide the State had proven beyond a reasonable doubt.

But as to the charge it's proposed you plea to, those are the elements, and that second element, as I indicated requires proof that you acted—that your conduct was criminally reckless, and I'm going to indicate what the jury would be instructed about that.

The jurors would be told that criminally reckless conduct requires that your conduct created an unreasonable and substantial risk of death or great bodily harm to another person and that you were aware that your conduct created such a risk. Do you understand the things that would have to be proven before a jury could find you guilty of first degree reckless homicide?

(*Id.* at 104–05.) Petitioner replied, "I think so." (*Id.* at 105.) The court asked if she wanted time to talk with defense counsel and she said she did.

After a break, the court said "I don't know if I confused the issues by talking about the offense of first degree reckless homicide as opposed to the first degree intentional homicide elements" (*id.* at 106), and asked defense counsel if he needed more time to talk with petitioner. After another short break the colloquy resumed and the court asked petitioner a number of questions including questions about the state's burden, her right to present evidence, the finality of her plea, and the length of a possible sentence. Petitioner answered these questions and indicated that she understood them. Finally, the court asked her for her plea to the charge of reckless homicide, and petitioner indicated that she pleaded "guilty." (*Id.* at 110.)

Petitioner's counsel informed the court that petitioner did not dispute the allegations in the complaint, and the court then questioned petitioner about each allegation. Petitioner admitted that she had an argument with the victim, that she followed him downstairs and took the phone away from him, that she pushed him, panicked when he did not move, that she placed barbells on his chest, and that she understood that the barbells were found on his neck. When the court asked if she agreed that she caused the death, she initially responded, "The barbells, no." (*Id.* at 112.) When the court then asked for clarification she explained that she put the barbells on the victim's chest and that apparently the death was caused when the barbells rolled from his chest to his neck.

The state then presented additional information to support the factual basis for the plea, none of which petitioner disputed. The state indicated that death was caused by asphyxia, either from the pressure of the barbells or from pressure applied before the barbells were placed on the neck. The court then asked petitioner a number of short questions clarifying what she had done and what she had told the police. She answered those questions without difficulty.

The court then asked petitioner another multi-page, multi-subject question:

Ms. Braunreiter, if this charge were to proceed to trial, the jury would listen to whatever evidence was presented. The state could offer evidence, and that could, if the State wanted to, include evidence of what you told the police. You'd be entitled to contest that evidence and that includes testifying yourself. As I mentioned earlier, you don't have to testify, but you could—you could take the stand and testify, including testifying to what you believe happened about where you placed the barbells when you placed them.

The jury would then have to take whatever evidence it had, and it would be up to the jury to decide whether you caused the death of this person. But before they could find you guilty of first degree reckless homicide, they'd have to be satisfied beyond a reasonable doubt that you caused his death. You did some act that caused his death. It doesn't mean that's the only thing that caused it. The jury would be told that that means they'd have to find that what you did was a substantial factor in producing his death as a natural result.

The jurors would also—again, they'd have to decide what they believed happened, and then they'd have to decide not only whether you caused the death, but whether or not what you did constituted criminal reckless conduct, and unless they were satisfied of that beyond a reasonable doubt, they could not find you guilty.

I don't know exactly what package of evidence they would hear, but they would have to rely on the evidence they heard and make a decision about that. And again, criminally reckless conduct requires that they find that you engaged in conduct that created an unreasonable and substantial risk of death or great bodily harm to Mr. Spolowicz and that you were aware that your conduct created such a risk.

Thirdly, they'd also have to be satisfied beyond a reasonable doubt, based on what they decide happened, that you acted with utter disregard for human life.

Now, that term isn't really defined for jurors. They're pretty much left to decide what that means, but they're generally told that in determining whether the conduct showed utter disregard for human life, they should consider all of the factors relating to the conduct. These include what you were doing, that is, what the defendant was doing, why you were doing it, how dangerous the conduct was, how obvious the danger was, and whether the conduct of the defendant showed any regard for human life. Do you have any questions about the things that would have to be proven before a jury could find you guilty of this charge?

(*Id.* at 116–18.) Petitioner replied "yeah," and "it seems like everything's being rushed right now." (*Id.* at 119.)

The court then advised petitioner that "there's going to come a time when you have to make a decision on this . . . . I don't want to rush you, but there is going to come a time when you have to make that decision," to which petitioner replied, "I know." (*Id.*)

The court then said: "I generally do not accept a guilty plea on the morning of trial, at least not pursuant to some negotiations." (*Id.*) Petitioner responded she understood she had to make a decision but "there's a lot of things I don't understand and I don't get to see my attorney that often." (*Id.*) The court then said: "let's go off the record and see if there's some date for an adjourned pre-trial here." After further discussion the court said: "I'm going to try to set another date between now and the trial date where we can find out what the positions are." (*Id.* at 119–20.)

Petitioner's counsel said:

"I just—I just want—I want to just make a record. I've—as to why—I mean, I don't want to keep coming back and going through this on a daily basis. I met with Ms. Braunreiter and most

recently spent an hour with her on 2/16/99. Spent 1.3 hours with her yesterday—or on the 19th. I spent 1.5 hours with her yesterday ... we should do something today rather than keep coming back here because—I mean, if it's going to be a trial, then we have to get in a trial posture and."

(*Id.* at 120–24.) The court replied that: "We do not have an intervening date between now and trial, and unless there's a request for one, I won't—I won't require it." (*Id.* at 121.) Petitioner's counsel did not request one.

## B. Proceedings on March 4

The parties next appeared in court on the trial date, March 4. Petitioner's counsel stated that petitioner wanted to plead guilty to the reckless homicide charge:

That's what she wants to do. I met with her as late as yesterday afternoon. That's what she wants to do. She doesn't want to go to trial on first degree intentional, and it's certainly in her best interest to resolve it, in my opinion, as a first degree reckless and continue with the plea. That's her desire.

(*Id.* at 126–27.)

The court then asked the state's position on whether the court should accept the guilty plea. The assistant district attorney responded that he believed that a reasonable juror could conclude that the defendant's conduct was reckless or that it was intentional. He indicated that any doubt should be given to the defendant and that the defendant had made about "a ninety-something percent effort" to plead guilty to the reckless charge. He indicated that the victim's family preferred that the charge be intentional homicide but that "if the court accepts the plea it certainly is not any kind of miscarriage of justice." (*Id.* at 140–41.)

Petitioner's counsel reiterated that petitioner had previously accepted the state's offer to plead guilty to reckless homicide, that there was a factual basis for the plea, that as the assistant district attorney had indicated the defendant had all but completed the plea on February 21, and that she continued to want to plead guilty.

The court then stated that it was not going to accept the plea. The court acknowledged that it did not have a transcript of the earlier proceeding and did not "recall exactly what [petitioner] said." (R. 12 Ex. E App. at 148.) However, the court recalled having a question "as to whether she was admitting a factual basis" (*id.* at 147), and that "she was reluctant to even acknowledge that she had caused this death" (*id.* at 148).

## C. Trial, Sentence and Appellate Review

Petitioner was convicted of first degree intentional homicide and the court sentenced her to life imprisonment. Despite the state's recommendation that the court not set a parole eligibility date, in which case petitioner would have been parole eligible after thirteen years and four months, the court set a parole eligibility date of April 5, 2021, or after twenty-five years. (*Id.*)

Petitioner appealed her conviction to the state court of appeals arguing that the trial court abused its discretion by refusing to permit her to plead guilty to reckless homicide. The court of appeals concluded that the case was appropriate for summary disposition and affirmed. Petitioner unsuccessfully sought review in the state supreme court.

## II. DISCUSSION

Several conclusions can reasonably be drawn from the colloquy on February 21. First, petitioner made clear to the court that she wanted to plead guilty. Moreover, she acknowledged that she was guilty and completed almost the entire plea colloquy without any difficulty. Petitioner, a middle-aged alcoholic with a high school education, unequivocally answered each question the court asked as long as the question was clear and of manageable size. Only when she was asked a multi-page, compound question did she become flustered or confused. It is reasonable to

infer from the record that her confusion was caused in substantial part by the court's questions. It is possible, of course, that the court's questions were not the sole reason that the plea broke down. Petitioner may have had some doubts about pleading guilty. But the phrasing of the questions clearly was the catalyst that caused the plea to fall apart.

Second, the colloquy makes clear that on February 21, 1996, the court intended to give petitioner at least some period of time to resolve her doubts. The court twice told her that there was going to come a time when she had to make a decision.

Third, by not following the court's suggestion to set a pretrial date at which petitioner could have pleaded guilty rather than hoping the court would allow a plea on the trial date, petitioner's counsel made a serious error. The record suggests that he was irritated at petitioner either because she complained about not seeing him enough or because she did not successfully complete the plea, or both. While such irritation may have been justified, counsel's failure to set a pretrial date was incautious and unwise.

Several conclusions can also be drawn from the March 4 colloquy. First, the court did not accurately recollect what was said at the February 21 hearing. As the court acknowledged, it did not have a transcript of the earlier hearing. The court also did not ask the reporter to read back the minutes of the proceeding. As a result, for example, in recounting what it recalled happened on February 21, the court did not mention that the phrasing of its questions was a substantial reason that the plea broke down or that it had indicated to petitioner that she had some time left to make a decision whether or not to plead guilty. Had the court reviewed what was said on February 21, it might have been prompted to ask petitioner whether she had had a chance to think things over, resolve her doubts and make a final decision. The court made no such inquiry, and in fact did not ask any questions of petitioner.

Second, the court stated that it was rejecting the plea because it recalled that on February 21 it had "serious questions as to whether she was admitting a factual basis" (*id.* at 147), and also recalled that petitioner was "reluctant to even acknowledge that she had caused this death" (*id.* at 148). The transcript of the February 21 hearing does not support these recollections. Petitioner admitted that she pushed the victim to the floor and that she placed a set of barbells on his chest and learned later that the barbells were found on his throat. She explained that he did not move after she pushed him and that she panicked and wanted to make it look like an accident.

The only ambiguity arose when the court asked her, "Do you agree in your own mind that what you did caused his death?" (*Id.* at 112.) Petitioner responded, "The barbells, no." (*Id.*) It appears that by this petitioner meant only that she did not put the barbells directly on his neck. As the following exchange indicates, petitioner was not denying a factual basis for the offense or having caused the victim's death:

> The Court: What do you think caused his death?
>
> The Defendant: Well, after they told me they were found on his neck, and I thought, well, maybe because of his chest, you know, it comes out like this, it rolled off onto his neck, and because he laid there for so long, it might have rolled onto his neck.

*Id.* In addition, the prosecutor offered additional facts, which petitioner did not dispute, showing that the cause of death was asphyxiation either from the barbells or from strangulation before the barbells were put on the neck. (*Id.* at 113.)

Thus on March 4, on the basis of its flawed recollection of what transpired on February 21, the court rejected petitioner's request to plead guilty to first degree reckless homicide, a disposition which the state did not oppose. By refusing to accept petitioner's plea on March 4, the court in effect punished her for having become

confused on February 21 and for her lawyer's mistake of failing to set a plea date before the trial date.

Several conclusions can also be drawn from the court of appeals's decision. First, the court disposed of the case summarily. Secondly, in its perfunctory opinion, the court did not separately analyze the appropriateness of the trial court's rejection of petitioner's plea on February 21 when she was confused, and its rejection of her plea on March 4 when she was no longer confused.

### III. PROCEDURAL DEFAULT

■ A state prisoner's petition to a federal court for a writ of habeas corpus may be granted where there has been a violation of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). However, a federal habeas petitioner may procedurally default her federal law claim if she does not first fairly present the substance of the federal claim to the state courts. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *United States ex rel. Sullivan v. Fairman,* 731 F.2d 450, 453 n. 4 (7th Cir.1984). The reason for this requirement is to give the state an opportunity to pass upon and correct alleged violations of its own prisoners' rights. *Wilks v. Israel,* 627 F.2d 32, 38 (7th Cir.1980). The requirement is rigorously applied in the Seventh Circuit. *Riggins v. McGinnis,* 50 F.3d 492, 493 (7th Cir.1995).

Petitioner's federal law claim is that the trial court denied her due process of law when it rejected her proffered guilty plea to reckless homicide. Respondent argues that petitioner did not assert a federal due process claim in the state courts and thus has procedurally defaulted it. Respondent contends that in the state courts petitioner argued only that the trial court abused its discretion by rejecting her plea and that this argument was not sufficient to alert the state courts that she was raising a federal constitutional claim. Petitioner acknowledges that she did not expressly raise a due process claim in the state

courts but argues that she presented it in substance.

■ The Seventh Circuit has identified several factors as being important in determining whether a federal constitutional issue not expressly raised in state court was nevertheless fairly presented to the state forum. These factors include whether the petitioner relied on relevant federal or state cases employing constitutional analysis, whether the petitioner asserted a claim in terms suggesting a specific constitutional right, and whether the petitioner presented a fact pattern within the mainstream of constitutional litigation. *Verdin v. O'Leary,* 972 F.2d 1467, 1473–75 (7th Cir.1992). The *Verdin* court indicated that if a claim was based on a fact pattern not commonly thought to involve constitutional issues, it was unlikely that the state court was alerted to its supposed constitutional nature. *Id.*

■ Here, in addition to not expressly arguing due process in the state courts, petitioner did not rely on federal or state cases employing constitutional analysis, assert a claim so particular as to suggest a specific constitutional right, or allege a fact pattern within the mainstream of constitutional litigation. Nor did she use the words "due process," "fundamental fairness" or "fairness" in her briefs to the state appellate courts.

Petitioner contends that by arguing in state court that the trial court abused its discretion in rejecting her proffered plea, she raised the substance of the due process claim because both the abuse of discretion and due process claims involve the same method of analysis. *See Bisaccia v. Attorney General,* 623 F.2d 307, 310 (3rd Cir.1980). However, although the abuse of discretion and due process claims are somewhat similar, the two claims nevertheless raise separate legal issues. "The task of the habeas court in adjudicating any issue of fair presentment is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the

federal constitutional nature of the issue." *Verdin*, 972 F.2d at 1476. Notwithstanding the similarity between the abuse of discretion and due process claims, petitioner's state court briefs cannot reasonably be said to have alerted the Wisconsin courts that she was raising a federal constitutional issue.

█ Further, the rule that a claim must be fairly presented in state court is applied particularly rigorously to claims involving procedural due process violations. *Kurzawa v. Jordan*, 146 F.3d 435, 443 (7th Cir. 1998) (indicating that leeway afforded habeas petitioners in reformulating due process arguments on collateral review is more limited than in other constitutional contexts); *see also Riggins*, 50 F.3d at 493 (stating that habeas petitioner claiming state trial court denied him due process must say so not only in federal court but in state court). With respect to this principle, the Seventh Circuit has stated:

> [T]he principal interpretive hazard inherent in the [procedural default analysis] ... is one of specificity. And the problem of specificity is perhaps at its greatest when the court must deal with a procedural due process claim ....
> [W]ith respect to due process claims, the contours of the possible constitutional claims are, of course, particularly indistinct and the overlap of state and federal jurisprudence particularly striking. Here, there is a special danger that a claim in state court "may well present the echo of a federal claim" while not alerting the state court to the federal nature of the claim.

*Verdin*, 972 F.2d at 1474 (citations omitted).

Finally, in *Wilks v. Israel*, 627 F.2d 32 (7th Cir.1980), the Seventh Circuit addressed whether a habeas petitioner who argued in state court that the trial court abused its discretion by not accepting his plea to a lesser charge fairly presented a due process claim. The trial court refused to accept a guilty plea to a lesser charge because during the plea colloquy the petitioner declined to admit that he committed the offense. The Seventh Circuit concluded:

> Although we think it a close question, we find that petitioner failed to exhaust his constitutional claim by not raising it in the state appellate courts. While the claim he presented to the trial court arises out of the same factual circumstance as the constitutional claim, it is a separate legal issue.

*Id.* at 38.

Petitioner argues that the present case is distinguishable from *Wilks* because it involves an issue of fundamental fairness whereas in *Wilks* the defendant refused to admit guilt. I agree with petitioner that the facts of the present case suggest greater unfairness than those of *Wilks*. However, the issue of unfairness was never expressly raised in state court. I reluctantly conclude therefore that circuit precedent compels me to find that petitioner did not fairly present her federal due process claim in state court and thus has procedurally defaulted it.

### IV. CONCLUSION

Based on my conclusion with respect to the issue of procedural default I need not address the substantive issue raised by petitioner's claim, whether the trial court's rejection of her plea on March 4 was so arbitrary as to constitute an unreasonable application of Supreme Court precedent.

As I indicated earlier, I find this case a troubling one. Because the role of the federal courts as the guardian of individual rights has been considerably diminished in the habeas corpus context, state courts have a greater responsibility to ensure that defendants in criminal cases are treated fairly. In the present case I do not believe that petitioner was treated fairly. In attempting to plead guilty to a charge that the state agreed was appropriate, petitioner's only mistake was to become confused.

Nevertheless, for the reasons stated,

**IT IS HEREBY ORDERED** that the petition for the writ of habeas corpus is **DENIED,** and this case is **DISMISSED.**